IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| LARRY D. REID and LARRY REID LIVE, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>LAVONTRAYE ANDREWS,<br><br>    Defendant. | COMPLAINT<br><br>No. 1:22-cv-880 |

Plaintiffs, Larry D. Reid and Larry Reid Live, LLC, by and through their undersigned counsel, would respectfully allege and show as follows:

## INTRODUCTION

1.  Plaintiff Larry D. Reid ("Reid") is an ordained minister, author, songwriter, gospel recording artist and actor. Reid is also well-known as an online commentator who discusses matters involving pop culture, politics and religious leaders and their movements.

2.  Plaintiff, Larry Reid Live, LLC ("LRL") is sponsored by the MBN Network, which is a 501(c)(3) compliant ministry. LRL airs to a combined audience of nearly 400,000 people weekly on Facebook and YouTube with over thirty-two million views on YouTube alone. Reid and LRL are referred to collectively as "Plaintiffs."

3.  Defendant, LaVontraye Andrews ("Defendant"), angry with Reid for unrelated matters, has knowingly disseminated false allegations on at least two social media platforms alleging that he was molested by Reid almost twenty years ago during the time Reid was a Pastor in North Carolina. The purpose of this smear campaign is to cause humiliation and embarrassment, and to tarnish the reputation of Reid and the LRL brand.

1

## PARTIES, JURISDICTION AND VENUE

4. Reid is an individual and resident of Fulton County, Georgia.

5. LRL is a limited liability company organized under the laws of the State of Georgia with its principal place of business in Fulton County, Georgia. LRL neither has, nor at any time relevant hereto had, branches, offices, or facilities in the State of North Carolina. Reid is the sole member of LRL.

6. Defendant is an individual and resident of Forsyth County, North Carolina.

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a)(1) in that the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between the parties.

8. This Court has personal jurisdiction over Defendant.

9. Venue in this Court is proper pursuant to 29 U.S.C § 1391(b)(1) in that the Defendant, a resident of Forsyth County, North Carolina, resides within the Middle District of North Carolina, Winston Salem Division.

## FACTUAL BACKGROUND

10. As outlined in the introduction above, Reid is an ordained minister, whose ministry was centered around deliverance and restoration. He also provided housing for certain displaced members/congregants and troubled youth within his homes and the homes of other church leadership.

11. From August 2001 to March 2007, Reid was the pastor of The Breakthrough Church in Fayetteville, North Carolina, ("the Church") which was a large congregation consisting of 125 members.

12. Defendant's mother Sharon Andrews-Bennison was a member of the Church and a leader within the congregation.

13. While a member of the Church's congregation, Defendant's mother expressed her concerns about her then 15-year-old son and his uncontrollable behavior, which included theft and lying.

14. As a result, Defendant's mother solicited the help of Reid's assistant pastor, Chamaco Bryant ("Bryant') to mentor the Defendant in the hope of changing his troubling behavior.

15. Reid was not a part of this mentorship arrangement, nor did he personally know Defendant during this time.

16. Bryant was part of the music department, and helped the Defendant develop his skills on the drums as part of this mentorship arrangement.

17. In 2007, Defendant, who was 17 at the time, and his mother needed a place to live, and the family moved from their home in Raeford, North Carolina, to Raleigh North Carolina to live with Bryant. As part of his ministry, Bryant routinely allowed displaced families and their children to stay with him and his family until they got back on their feet.

18. While living with Bryant, Defendant was introduced to Reid. Despite Bryant's efforts and mentorship, the Defendant continued to display troublesome and unruly behavior.

19. In 2008, Defendant, who was unable to maintain a steady residence, requested and was allowed to move into a home owned by Reid and located at 3216 Olustree Drive, Raleigh, North Carolina 27610 ("the Olustree Drive Home").

20. After moving into the Olustree Drive Home, Andrews lived with Reid's nephews, Samuel and Damion Reid, and Reid's assistant Vincent Hill. Reid and Vincent Hill moved out of the Olustree Drive Home shortly after Defendant moved in.

21. After Reid's departure from the Olustree Drive Home, another family moved in. Defendant continued to engage in the same concerning and troublesome behavior, and even stole his new housemates' vehicles in the middle of the night. As a result, Defendant was asked to leave the Olustree Drive Home.

22. In 2009, Reid moved back into the Olustree Drive Home and allowed Defendant, who by then was homeless, to move back in. At the same time, three additional church members resided in the home.

23. However, after three months, Defendant was again asked to leave as he continued to break house rules and wreak havoc within the Olustee Drive Home and in Reid's ministry.

24. Defendant began a sexual relationship with Ashley Andrews, who was a leader in the church about five years his senior, and they were both asked to leave the ministry. Eventually Defendant and Ms. Andrews apologized and asked to come back into the ministry. Reid allowed them to come back to the church.

25. Defendant and Ms. Andrews returned to the ministry and continued to communicate, socialize, and participate in Reid's Billboard Chart-topping music group and continued a ministerial relationship with Reid for years.

26. However, in 2017, Reid decided to dismantle his brick-and-mortar church completely and severed all communications with all members. Upon information and belief, this enraged the Defendant and led him to begin the smear campaign with is the subject of this Complaint.

### Larry Reid and Larry Reid Live, LLC

27. Reid is an online personality who produces and appears in YouTube video programs on a YouTube channel called Larry Reid Live through LRL. The LRL channel has over 130,000 subscribers with over 32 million views.

28. The program, Larry Reid Live ("the Program"), began streaming in June 2016. It is freely available on YouTube and promoted in various ways including by an associated business page on Facebook

29. The Program is supported by its Patreon subscribers and by advertising and donations. As a result, the program generates considerable revenue. The plurality of this is generated through Patreon subscriptions, which account for a substantial fraction of LRL's gross monthly revenue.

30. Episodes of the Program initially stream live, and past episodes remain available on the LRL channel and may be viewed after their first livestream.

31. Episodes generally follow a talk show format, with monologues by Reid, discussions of a variety of topics, remote interviews with guests, music, and live calls with viewers, who engage with Reid on the topics presented on the program. During each episode, viewers may also comment online, and those comments appear in real time as a text stream that appears beside the video.

32. Reid discusses a variety of topics most of which center on faith, spirituality, the Gospels, personal and spiritual growth, and events and affairs in the faith communities familiar to Reid and his viewers.

33. Reid does so in a humorous and relatable way intended to be accessible to a broad audience. Reid reviews books, discusses music, and comments on personalities and trends in the

ministry, and events in the church, including what he considers the pernicious effects of greed, hypocrisy, and scandal. He also discusses general and non-religious matters, such a current events, cultural happenings, controversial topics, and politics.

34. Episodes of the Program also contains advertisements, embedded in the video stream by YouTube. What advertisements appear during varies by viewer and is determined by YouTube's algorithms.

35. Paid advertising revenue is shared with YouTube, and accounts for about twenty percent (20%) of program revenue. Also, movies, plays, and films pay to advertise upcoming projects on the Program.

36. The Program is a commercial enterprise, and generates incomes and profit for LRL, of which Reid is the sole member. Along with the subscription and advertising revenues described above, the Program promotes Reid generally, and directs attention and potential business to his other ventures, which include The MBN Network, Reformation Church of Atlanta, and his personal teaching, speaking, in-person appearances, acting and musical performances.

37. As of October 12, 2022, LRL has approximately 380,000 subscribers or followers across Facebook and YouTube. Gross revenues for Reid and LRL from all activities, online and offline, are estimated to be between Forty Thousand Dollars ($40,000.00) and Sixty Thousand Dollars ($60,000.00) per month. The Program, its subscribers and its advertising revenues are the central activities upon which other income stream depends.

**Defendant's Campaign Against Reid**

38. Beginning in December 2019, social media personality Darryl Moore began to disseminate a series of videos and live streaming videos on YouTube which persistently, and with

growing intensity, leveled defamation allegations against Reid, including the false allegation that Reid had sexually molested Defendant.

39. On his YouTube channel, Moore revealed a 2018 police report cover from Raleigh, North Carolina. The police report cover does not bear Reid's name but shows the Olustree Drive Home's street address and reflects an allegation of forcible fondling. Reid was never made aware of this incident report prior to Moore's YouTube video.

40. Moore invited Defendant on his YouTube channel, where Defendant claimed that he filed this police report against Reid, alleging that he reported that he was molested at the age of fourteen. Reid was never contacted, no charges were ever brought, and there is currently no active investigation into this claim by the Raleigh Police Department.

41. After Andrews interview on Moore's platform, on April 20, 2021, Reid sent a cease-and-desist letter to Defendant through his counsel.

42. As a result of the cease-and-desist letter, it appeared that Andrews refrained from spreading the false child molestation rumors until his most recent alliance with Lamor Whitehead ("Whitehead").

43. On July 24, 2022, Whitehead, a pastor of a New York based church was robbed at gunpoint while streaming his online church service. Reid posted the video of the robbery on the LRL platform. As a result of Reid posting the footage, the robbery video was shared and went viral.

44. Whitehead, upset with Reid for publicizing the robbery, began a campaign against Reid. Whitehead obtained the videos of Moore's interview of Andrews and created an "Exposing Reid" segment on his Facebook platform where he played the interviews for thousands of viewers.

During the videos, the Defendant's defamatory statements were rebroadcast to a much wider audience.

45. Prior to the release of this video on Whitehead's channels, Reid took to his platform to denounce all of these rehashed claims. Reid reiterated that these allegations are false, and that he did not know Defendant when he was a minor.

46. Whitehead eventually removed all the videos produced by Moore including the interview by Andrews, but not before they were viewed thousands of times.

47. However, on October 8, 2022, Whitehead announced on his Facebook page that that he was going to have a guest on his Live show who would accuse Larry Reid of sexual abuse and sexual molestation of a minor. This guest was the Defendant.

48. On that same day, on Whitehead's Facebook and YouTube platforms, Defendant made the following allegations:

   a) "Larry Reid molested me" (52:19-35)

   b) When asked about the "open investigation" in North Carolina, referring to his 2018 incident report, Defendant claimed that the investigation in North Carolina "is for sure still open," which falsely suggested there is an active investigation by the Raleigh Police Department against Reid for sexual misconduct. (1:12:10-31)

   c) That his allegation of molestation "is proven" (52:31).

   d) "The reality is he did something inappropriate with a teenager, a child." (54:10-21).

   e) "In a nutshell, he molested me." (54:21-30)

   f) He (Reid) did things to him and gave it a "spiritual basis." (55:40-44).

49. Each of these allegations is false. Reid never molested Defendant. Further, the Raleigh Police Department is not currently actively investigating any claims of molestation against

8

Reid, nor has Defendant proven his allegations are true. In fact, the Defendant has not put forward any evidence to support his claims.

50. Andrews then used this time on Whitehead's platform to clean up the obvious discrepancies and contradictions in his initial allegations in the Moore interview. He now claims:

    a) "He lived with Reid at several different locations and that [the Oulstree Street Home address] was the only address he could remember." (52:58-53:17).

    b) "Getting to the age thing, one of the other guys that I talked to...a couple years ago, I did an interview with a guy and me talking quick, I said 14. . . . [but] I was 15 when it happened." (53: 36 to 54:10).

51. Despite knowing these allegations are false, Defendant has continued making them publicly and seems to be willing to work with anyone who has a vendetta against Reid and who will give him a platform to spew these vile and false allegations, Defendant clearly intends to Reid's reputation, brand, and livelihood.

## FOR A FIRST CAUSE OF ACTION
### Defamation and Slander *per se*

52. Plaintiffs reallege and incorporate the allegations of Paragraphs 1-51 of the Complaint, and all subparts thereof, as though fully set forth herein, verbatim.

53. As set forth above in Paragraph 48 and all subparts thereof, and incorporated herein by reference as though fully set forth, the Defendant spoke base or defamatory words which tended to prejudice Reid in his reputation, business, and means of livelihood, and which were intended to and did hold him up to ridicule, disgrace and contempt by falsely accusing Reid of committing a crime involving moral turpitude, specifically sexual abuse of a minor.

54. The statements identified in Paragraph 48 and all subparts thereof, and fully incorporated herein by reference as though fully set forth, are in fact false.

55. The statements identified in Paragraph 48 and all subparts thereof, and fully incorporated herein by reference as though fully set forth, were and are defamatory per se because they impugn Reid and his character as it relates to his trade or profession, to wit, both as a member of the ministry and in his online activities, both ministerial and as a commentator and online personality.

56. The defamatory statements made and published by Defendant have damaged Reid's reputation and character within his profession and industry and have interfered with his current and prospective business relationships.

57. Defendant knew or should have known that his defamatory statements made were false and he acted in reckless disregard of the truth or falsity of those statements when he made them. Defendant's actions constitute actual malice.

58. Defendant's defamatory statements were published to a third party by way of broadcast on Whitehead's YouTube channel and Facebook page.

59. As a direct and proximate result of Defendant's actions, Reid has been damaged in an amount in excess of $75,000.00, the exact amount to be shown at trial.

**FOR A SECOND CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**

60. Plaintiffs reallege and incorporate the allegations of Paragraphs 1-51 of the Complaint, and all subparts thereof, as though fully set forth herein, verbatim.

61. As set forth herein, Defendant has engaged in intentional extreme and outrageous conduct intended to cause Reid severe emotional distress.

62. Specifically, Defendant has falsely accused Reid of sexual misconduct against him when he was a minor, as set forth in Paragraph 48 of the Complaint.

63. Defendant's false statements were outrageous and extreme, and were intended to, and in fact did, cause Reid sever emotional distress.

64. As a direct and proximate result of Defendant's tortious conduct, Reid has been damaged in an amount in excess of $75,000.00, the exact amount to be shown at trial.

**FOR A THIRD CAUSE OF ACTION**
**Unfair and Deceptive Trade Practices, N.C. Gen. Stat. § 1-75.1 *et seq*.**

65. Plaintiffs reallege and incorporate the allegations of Paragraphs 1-51 of the Complaint, and all subparts thereof, as though fully set forth herein, verbatim.

66. Defendant's above-referenced defamatory statements were in commerce or affected commerce as set forth and defined in N.C. Gen. Stat. § 75-1.1 *et seq*.

67. Defendant's above-referenced defamatory statements constitute unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes, as, among other things, Defendant acted in a manner that was immoral, unethical, oppressive, had a tendency to deceive, and/or was substantially injurious to Plaintiffs.

68. Defendant engaged in unfair and deceptive trade practices by, among other things, falsely accusing Reid of sexual misconduct and sexual abuse of a minor, falsely stating that Reid was the subject of an ongoing police investigation, falsely stating that his allegations of sexual misconduct were proven, and falsely stating that Reid molested him. These false statements were intended to and in fact did interfere with Plaintiffs' business.

69. As a direct and proximate result of the Defendant's unfair and deceptive actions, Plaintiffs have been damaged in an amount in excess of $75,000.00, the exact amount to be proven at trial.

70. Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs are also entitled to recover trebled compensatory damages from Defendant.

71. Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs are also entitled to recover their reasonable attorney's fees from Defendant.

## FOR A FOURTH CAUSE OF ACTION
**Punitive Damages- N.C. Gen. Stat. § 1D-1 *et seq*.**

72. Plaintiffs reallege and incorporate the allegations of Paragraphs 1-51 of the Complaint, and all subparts thereof, as though fully set forth herein, verbatim.

73. As set forth herein, Defendant has acted willfully, wantonly, maliciously, and fraudulently by making the false and defamatory statements described herein.

74. Plaintiffs are entitled to an award of punitive damages pursuant to N.C. Gen. Stat. § 1D-1, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that they be granted the following relief:

1. That Judgment be entered against Defendant and in favor of Plaintiffs, in excess of $75,000.00, on each and all Causes of Action;

2. That Plaintiffs be awarded punitive damages against Defendant as the jury may determine;

3. That Plaintiffs be awarded costs and reasonable attorney's fees;

4. That Plaintiffs have a trial by jury; and

5. For such further and other relief as the Court deems just and proper.

*Signature on Following Page*

Respectfully submitted, this 13th day of October, 2022.

/s/ Ryan M. Arnold
Ryan M. Arnold (N.C. Bar No. 52010)
TAYLOR ENGLISH DUMA LLP
13925 Ballantyne Corporate Place, Suite 200
Charlotte, North Carolina 28277
984.232.2992
rarnold@taylorenglish.com

Amanda G. Hyland (GA Bar No. 325115)
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
678.336.7247
ahyland@taylorenglish.com
*Notice of Special Appearance Forthcoming*

*Counsel for Plaintiffs*